Filed 1/19/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| STATE OF CALIFORNIA ex rel. ROBERT G. BARTLETT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>GENE MILLER et al.,<br><br>    Defendants and Respondents. | B259472<br><br>(Los Angeles County<br>Super. Ct. No. BC469191) |

APPEAL from an order of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Reversed and remanded.

Howarth & Smith, Don Howarth, Suzelle M. Smith, Jessica L. Rankin; Berney Law Corporation and Russell L. Berney, for Plaintiff and Appellant.

Foley & Lardner and Thomas F. Carlucci, for Defendants and Respondents Gene Miller and ClubCorp Porter Valley Country Club, Inc.

Kamala D. Harris, Attorney General, Martin H. Goyette, Senior Assistant Attorney General, Frederick W. Acker, Acting Supervising Deputy Attorney General, Courtney Towle, Deputy Attorney General, for the People of the State of California.

_____

Robert G. Bartlett appeals from the order entered after the trial court granted the State of California's motion to dismiss his amended *qui tam*[1] complaint, filed on behalf of himself and the State under the California False Claims Act (CFCA) (Gov. Code, § 12650 et seq.),[2] alleging ClubCorp Porter Valley Country Club, Inc. and several related ClubCorp entities (collectively ClubCorp) had defrauded the State by failing to escheat the unclaimed initiation deposits of ClubCorp's members and former members.  The trial court ruled Bartlett's *qui tam* action was based on business practices ClubCorp had previously disclosed in publicly available filings with the United States Securities and Exchange Commission (SEC) and thus precluded by CFCA's public disclosure bar. Because the trial court applied an incorrect, overly broad interpretation of CFCA's public disclosure bar, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Bartlett's Original Action*

ClubCorp owns and operates a large number of country clubs throughout the United States, including Porter Valley Country Club in Los Angeles County where Bartlett had been a member for many years.  In September 2011 Bartlett sued ClubCorp and three of its managerial employees asserting contract and tort-related claims based on the Porter Valley club's termination of his membership.  In part, Bartlett alleged ClubCorp had breached its contract with him by refusing to refund his $7,500 initiation deposit.

### 2. *Bartlett's Amended Qui Tam Complaint*

On March 7, 2012 Bartlett filed a first amended complaint adding a *qui tam* claim alleging ClubCorp had knowingly concealed and avoided its obligation to escheat to the

---

[1]    "*Qui tam* is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" (*Rockwell International Corp. v. United States* (2007) 549 U.S. 457, 463, fn. 2 [127 S.Ct. 1397, 167 L.Ed.2d 190]; accord, *City of Hawthorne ex rel. Wohlner v. H&C Disposal Co.* (2003) 109 Cal.App.4th 1668, 1672, fn. 2.)

[2]    Statutory references are to this code unless otherwise indicated.

State millions of dollars in unclaimed initiation deposits in violation of California's Unclaimed Property Law (Code Civ. Proc., § 1500 et seq.). In support of this claim Bartlett cited statements made in ClubCorp's June 27, 2011 Form 424B3 Prospectus and September 6, 2011 Form 10-Q, both filed with the SEC and publicly available on the agency's online database, acknowledging ClubCorp's business practice of not escheating any of its members' unclaimed deposits.

3. *The State's Motion To Dismiss*

As required, Bartlett filed his *qui tam* action under seal and served the Attorney General with the amended complaint to permit the State to decide whether to intervene and prosecute the action on its own behalf. (See § 12652, subd. (c)(2), (c)(3).) On December 30, 2013 the State moved to dismiss the CFCA claim as jurisdictionally barred under former subdivision (d)(3)(A) of section 12652 (former subdivision (d)(3)(A)), which then provided, "No court shall have jurisdiction over an action under this article based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in an investigation, report, hearing or audit conducted by or at the request of the Senate, Assembly, auditor, or governing body of a political subdivision, or by the news media, unless the action is brought by the Attorney General or the prosecuting authority of the political subdivision, or the person bringing the action is an original source of the information."[3]

---

[3]    CFCA, including former subdivision (d)(3)(A), was amended effective January 1, 2013. Section 12652, subdivision (d)(3)(A), currently provides, "The court shall dismiss an action or claim under this section unless opposed by the Attorney General or prosecuting authority of a political subdivision, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed in any of the following: [¶] (i) A criminal, civil or administrative hearing in which the state or prosecuting authority of a political subdivision or their agents are a party. [¶] (ii) A report, hearing, audit, or investigation of the Legislature, the state, or governing body of a political subdivision. [¶] (iii) The news media."

Both Bartlett and the State assert the 2012 amendment was intended to clarify the public disclosure bar and effected no substantive change. We need not evaluate that assessment of the amendment because nothing in the amendment or its legislative history suggests an intent to make it retroactive; and both Bartlett and the State agree, as do we,

Styled a motion to dismiss rather than a demurrer or a motion for judgment on the pleadings, the State's motion attacked Bartlett's pleading on its face, arguing the facts contained in Bartlett's amended complaint—ClubCorp's failure to escheat the unclaimed deposits to any state—had been publicly disclosed as early as March 2011 when ClubCorp filed its Form S-4 Registration Statement with the SEC. As a result, the Attorney General argued, the court should dismiss the complaint in accordance with former subdivision (d)(3)(A)'s prohibition of *qui tam* actions based on certain types of publicly disclosed information. In support of the State's motion the Attorney General requested the court take judicial notice of ClubCorp's March 2011 Form S-4 filing, in which ClubCorp acknowledged: "[I]nitiation deposits paid by new members upon joining one of our clubs are fully refundable after a fixed number of years. . . . Historically, only a small percentage of initiation deposits eligible to be refunded have been requested by members. As of December 28, 2010, the amount of initiation deposits that are eligible to be refunded currently or within the next twelve months is $51.7 million on a gross basis. . . . While we will make a refund to any member whose initiation deposit is eligible to be refunded, we may be subject to various states' escheatment laws with respect to initiation deposits that have not been refunded to members. All states have escheatment laws and generally require companies to remit to the state cash in an amount equal to such unclaimed and abandoned property after a specified period of dormancy. We currently do not remit to states any amounts relating to initiation deposits that are eligible to be refunded to members based upon our interpretation of the applicability of such laws to initiation deposits. The analysis of the potential application of escheatment laws to our initiation deposits is complex, involving

the pre-2013 version of section 12652, subdivision (d)(3)(A), applies to this case. (See *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 841 [statute is presumed to be prospective only absent clear indication that Legislature intended retroactive application]; see also *Hughes Aircraft Co. v. United States ex rel. Schumer* (1997) 520 U.S. 939, 951 [117 S.Ct. 1871, 138 L.Ed.2d 135 ["though phrased in 'jurisdictional' terms, [the amendment to the federal False Claims Act] is as much subject to our presumption against retroactivity as any other"].)

an analysis of constitutional and statutory provisions and contractual and factual issues. While we do not believe that such initiation deposits must be escheated, we may be forced to remit such amounts if we are challenged and fail to prevail in our position." The S-4 Form also contained statements by ClubCorp that it was currently the subject of a multi-state audit conducted by a consortium of 20 of the 25 states in which it operated, to determine its compliance with those states' escheatment laws.[4]

The S-4 Form listed Porter Valley Club as one of the clubs ClubCorp owned and operated in California, but did not identify California as one of the 20 states participating in the audit. In a reply brief in support of the State's motion, the Attorney General submitted a declaration from Kathleen Imura Delmendo, an auditor with the California State Controller's Office, revealing that, since November 2008, California has been part of the multistate consortium conducting a national unclaimed property audit of ClubCorp's and its affiliates' escheatment practices.

Bartlett opposed the State's motion, arguing that information revealed in federally mandated SEC filings was not a public disclosure that barred a *qui tam* action under former subdivision (d)(3)(A). He also objected to Delmendo's declaration, filed together with the State's reply brief, as both untimely and irrelevant. As to the latter objection, Bartlett emphasized there had been no public disclosure of the State's participation in the multistate audit of ClubCorp's escheatment practices, even in ClubCorp's SEC filings. Finally, he asserted that, even if information disclosed in SEC filings qualified as a public

---

[4]     In its S-4 filing ClubCorp acknowledged that "20 separate states [of the 25 states in which it operates] have hired an independent agent to conduct an unclaimed and abandoned property audit of our operations. . . . [W]e expect to vigorously defend our position on the matter. However, if we are ultimately unsuccessful in arguing our right to continue holding such amounts, we may be forced to pay such amounts to the claiming states. While the audit is ongoing and we believe we have strong arguments against any potential claims for the escheatment of unclaimed initiation deposits made under state escheatment laws, if a material portion of the eligible unclaimed initiation deposits were awarded to any states, our financial condition could be materially and adversely affected . . . ."

disclosure within one of the categories specified in former subdivision (d)(3)(A), he was an original source of the information, an exception to the public disclosure bar.

4. *The Trial Court's Ruling Granting the State's Motion*

After hearing oral argument and taking the matter under submission, the trial court granted the State's motion and dismissed Bartlett's *qui tam* claim as prohibited by the public disclosure bar in former subdivision (d)(3)(A). Although it found Bartlett's interpretation of the statute superficially persuasive, the court concluded construing CFCA as Bartlett proposed would frustrate the Legislature's purpose of precluding parasitic *qui tam* actions based on information already in the public domain. Because ClubCorp's SEC filing was publicly available, the court reasoned, disclosures contained in it simply could not form the basis of a *qui tam* complaint under CFCA. To support its conclusion, the court relied extensively on several, mostly nonpublished, federal cases interpreting the federal False Claims Act (31 U.S.C. § 3729 et seq.) that found information in SEC filings had been publicly disclosed for purposes of barring a federal *qui tam* action.

Following the court's order dismissing his *qui tam* cause of action, Bartlett voluntarily dismissed without prejudice all his remaining claims and filed a timely notice of appeal limited to the order regarding his *qui tam* claim.

## DISCUSSION

1. *Governing Law and Standard of Review*

Patterned after the federal False Claims Act as amended in 1986, CFCA is designed to prevent fraud on the public treasury. (See *State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1296 ["California courts have consistently reaffirmed that the Legislature 'obviously designed [the CFCA] to prevent fraud on the public treasury'"].) By its terms, CFCA permits the State or a political subdivision of the State to recover civil penalties and treble damages from any person who knowingly presents a false claim for payment to the State or one of its political subdivisions (§ 12651,

6

subd. (a)(1)) or who knowingly files a false record or statement to conceal or decrease an obligation to pay the State or local governments (§ 12651, subd. (a)(7)).[5]

To assist the State and its political subdivisions in their efforts to protect the public fisc, CFCA also authorizes private parties, referred to as *qui tam* plaintiffs or relators, to prosecute the claim for, and in the name of, a government entity. (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 325; *City of Hawthorne ex rel. Wohlner v. H&C Disposal Co.* (2003) 109 Cal.App.4th 1668, 1676-1677 (*Wohlner*).) CFCA requires the *qui tam* plaintiff to file the lawsuit under temporary seal (§ 12652, subd. (c)(2)) and immediately notify the Attorney General and disclose all pertinent information about the lawsuit in his or her possession. (§ 12652, subd. (c)(3).) After investigation the State or political subdivision may elect to intervene in the *qui tam* action and assume control of the lawsuit. (§ 12652, subd. (c)(4)-(c)(8).) If intervention occurs, the *qui tam* plaintiff may continue as a party in the action. (§ 12652, subd. (e)(1).) If there is no intervention, the *qui tam* plaintiff may prosecute the action for, and in the name of, the State or the relevant political subdivision. (§ 12656, subd. (c)(6)(B), (c)(7)(D)(ii), (c)(8)(D)(iii); see *State ex rel. Harris v. PricewaterhouseCoopers, LLP* (2006) 39 Cal.4th 1220, 1228 (*Harris*).)

If a governmental entity does intervene, the *qui tam* plaintiff remains entitled to receive between 15 percent and 33 percent of the proceeds the State or its political subdivision recovers in the action or settlement, depending on the extent to which the *qui tam* plaintiff substantially contributed to the prosecution of the action. (§ 12652, subd. (g)(2).) If the State or its political subdivision does not intervene and the *qui tam* plaintiff prevails, the *qui tam* plaintiff is entitled to receive, in the court's discretion, between 25 percent and 50 percent of the proceeds recovered in the action or settlement. (§ 12652, subd. (g)(3).) In addition, a successful *qui tam* plaintiff may also recover his or

---

[5] The filing of a false record or statement to conceal or decrease an obligation to pay the government, the allegation in this case, is sometimes referred to as a "reverse false claim." (See *State ex rel. Bowen v. Bank of America Corp.* (2005) 126 Cal.App.4th 225, 236, 240.)

her reasonable costs of suit, including reasonable attorney fees.  (§ 12652, subd. (g)(8); see generally *Harris, supra,* 39 Cal.4th at pp. 1228-1229.)

a.  *The public disclosure bar of former subdivision (d)(3)(A)*

*Qui tam* claims based on certain categories of publicly disclosed information are barred unless the plaintiff is an original source of the information.[6]  (See former subd. (d)(3)(A).)  This prohibition, known as the public disclosure bar, is intended to prevent "'parasitic or opportunistic actions by persons simply taking advantage of public information without contributing to or assisting in the exposure of the fraud.'"  (*Wohlner, supra,* 109 Cal.App.4th at pp. 1677-1678; accord, *Mao's Kitchen, Inc. v. Mundy* (2012) 209 Cal.App.4th 132*,* 146 ["'[w]here there has been a public disclosure[,] the governmental authority is 'already in a position to vindicate society's interests, and a qui tam action would serve no purpose'"]; *State of California v. Pacific Bell Telephone Co.* (2006) 142 Cal.App.4th 741, 752 (*Pacific Bell*) ["'[a] relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation have already been publicly disclosed'"].)  In light of CFCA's purpose of protecting the public fisc, "the public disclosure bar should be applied only as necessary to preclude parasitic or opportunistic actions, but not so broadly as to undermine the Legislature's intent that relators assist in the prevention, identification, investigation, and prosecution of false claims."  (*Wohlner, supra,* 109 Cal.App.4th at p. 1687.)

Notwithstanding the broad policy underlying the public disclosure bar, however, former subdivision (d)(3)(A), like the current version of the statute, does not preclude *qui tam* lawsuits based on any public disclosure of the material information concerning the alleged false claim.  Rather, to trigger the bar, the information must have been publicly disclosed in one of the specific fora identified in the statute.  (*Pacific Bell, supra,* 142 Cal.App.4th at p. 749 ["the fora identified in the statute further limit our review" of

---

6    The federal False Claims Act has a similar public disclosure restriction on federal *qui tam* actions.  (See 31 U.S.C. § 3730(e)(4).)

whether a matter is subject to the public disclosure bar; "[w]hile plaintiff's alleged conversations might suggest that the issue was plainly in the public domain, conversations, even in very public venues, do not satisfy the public disclosure requirements of the statute"]; see Sylvia, *The False Claims Act:  Fraud Against the Government* (May 2015) (§ 12:16 ( ["[t]he California [false claims] statute prohibits actions based upon information already publicly disclosed in certain fora unless the relator is an original source of the information"]; see also *id.,* § 11:34 [the public disclosure bar in the federal False Claims Act does not prohibit a *qui tam* lawsuit based on all publicly disclosed information; it affects "only public disclosures *in* certain fora.  If those fora are not implicated the inquiry is at an end"].)

b. *Standard of review*

The State's motion to dismiss the *qui tam* complaint, which was based on the facts pleaded and matters subject to judicial notice, is reviewed de novo.  (*Wohlner, supra,* 109 Cal.App.4th at p. 1678 [standard of review of order granting motion for judgment on pleadings based on CFCA's jurisdictional bar is same as general demurrer, that is, de novo; we must accept as true all facts properly pleaded and judicially noticed]; *Pacific Bell, supra,* 142 Cal.App.4th at p. 748.)  Similarly, interpretation of CFCA's statutory public disclosure bar presents a question of law subject to independent review.  (See *Mao's Kitchen, Inc. v. Mundy, supra,* 209 Cal.App.4th at p. 147; *Pacific Bell,* at p. 748; see also *In re Clarissa H.* (2003) 105 Cal.App.4th 120, 125 ["interpretation of statutes presents questions of law subject to independent review on appeal"].)

In interpreting former subdivision (d)(3)(A), we begin with the plain language of the statute, giving the words their ordinary and common meaning.  (*Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 519.)  "If the language is unambiguous, the plain meaning controls," and no further analysis is warranted.  (*Id.* at p. 518; *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190.)  If the language allows more than one reasonable construction, we consider "such aids as the legislative history of the [statute] and maxims of statutory construction.

In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy." (*Wells,* at p. 1190.)

2. *The Trial Court Erred in Dismissing the Qui Tam Complaint as Barred by the Public Disclosure Provision in Former Subdivision (d)(3)(A)*

a. *An SEC filing is not one of the disclosures identified in former subdivision (d)(3)(A) as barring a qui tam action*

Former subdivision (d)(3)(A) deprived the court of jurisdiction over a *qui tam* false claim based on matters that had been publicly disclosed (1) in a criminal, civil or administrative hearing; (2) "in an investigation, report, hearing, or audit conducted by or at the request of the Senate, Assembly, auditor, or governing body of a political subdivision"; or (3) by the news media. (See *Pacific Bell, supra,* 142 Cal.App.4th at p. 750.) The second category—disclosure in an investigation, report, hearing or audit conducted by or at the request of the Senate, Assembly, auditor or governing body of a political subdivision—is at issue in this case: Bartlett contends the trial court erred in concluding the information in ClubCorp's Form S-4 report filed with the SEC amounted to a public disclosure barring a *qui tam* action within the meaning of this provision.

Bartlett does not dispute that ClubCorp's March 2011 SEC filing is publicly available and therefore constitutes a public disclosure in the literal sense. Nonetheless, he argues SEC filings do not constitute a public disclosure within one of the specific, statutorily enumerated fora or by the news media and therefore do not come within the statute's prohibitory language. The Attorney General, in contrast, attempting to fit an SEC filing into one of former subdivision (d)(3)(A)'s categories, insists the SEC filing is a publicly available "report," full stop. The term "report," she urges, is unmodified by the qualifying phrase "conducted by or at the request of the Senate, Assembly, auditor or governing body of a political subdivision." Yet the Attorney General offers no explanation for the presence of that phrase at all, in effect intimating that we should simply ignore it. That we cannot do. (See *Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [it is a fundamental principle of statutory construction that we "'give "significance to every word, phrase, sentence and part of an act in pursuance of the legislative purpose"'"]; *People v. Canty* (2004) 32 Cal.4th 1266, 1276 [same].)

The best argument we can construct from the Attorney General's silence about this qualifying language is that she would interpret it as modifying only its nearest antecedent, that is, the term "audit," and not the three other nouns in the sentence, "investigation, report, hearing." (See *Barnhart v. Thomas* (2003) 540 U.S. 20, 26 [124 S.Ct. 376, 157 L.Ed.2d 333] [under the rule of the last antecedent, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows"]; *White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [the "'last antecedent rule'" of statutory construction "provides that 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately precedent and are not to be construed as extending to or including others more remote'"].) Yet that rule "is not an absolute and can assuredly be overcome by other indicia of meaning." (*Barnhart,* at p. 26; accord, *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 530 ["the last antecedent rule is '"not immutable"' and should not be 'rigidly applied'"].) "'"[W]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all."'" (*White*, at p. 680; accord, *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743 ["[W]hen the sense of the entire act requires that a qualifying word or phrase apply to several preceding words, its application will not be restricted to the last. [Citation.] 'This is, of course, but another way of stating the fundamental rule that a court is to construe a statute "'so as to effectuate the purpose of the law.'"'"]; see also *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1412-1414 [last antecedent rule has several exceptions and should not be rigidly applied]; *Genlyte Group, LLC v. Workers' Comp. Appeals Bd.* (2008) 158 Cal.App.4th 705, 717 [the last antecedent rule is "not applicable when the natural construction of the language demands the clause be read as applicable to the first and other words, as well as to the last, or when the sense of the entire statute requires a qualifying word or phrase apply to several preceding words"].)

Here, restricting the phrase "conducted by" state and local authorities to its nearest antecedent, "audit," makes little sense. First, the Legislature identified civil, criminal and

administrative hearings as disqualifying venues in the first category of former subdivision (d)(3)(A). The term "hearing" in the second category, if left unmodified, would effectively swallow the entire first category, making it both unnecessary and redundant. (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 345 [reviewing court must avoid statutory interpretations that would render related words or provisions unnecessary or redundant]; *Pacific Legal Foundation v. Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 114 [whenever reasonable court should indulge in statutory interpretations that "avoid redundancy, and accord significance to each word and phrase"].) Similarly, an audit is necessarily conducted by or at the request of an auditor. If the modifying phrase applied solely to an audit, there would be no need for the qualifying phrase at all, effectively rendering it surplusage. (See *Reno v. Baird* (1998) 18 Cal.4th 640, 658 ["[i]t is a maxim of statutory construction that '[c]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word [or phrase] surplusage'"]; *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22 [same].)

Rather than focusing on the statutory language in former subdivision (d)(3)(A), the Attorney General relies on federal cases interpreting the public disclosure bar in the federal False Claims Act. (See, e.g., *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.* (N.D. Ga. 2012) 906 F.Supp.2d 1264, 1273; *United States ex rel. Jones v. Collegiate Funding Services, Inc.* (4th Cir., Mar. 14, 2012, No. 11-1103) 469 Fed. Appx. 244, 257 [2012 U.S. App. Lexis 5574]; *United States ex rel. Barber v. Paychex, Inc.* (S.D. Fla. Jul. 15, 2010) [2010 U.S. Dist. Lexis 83789], affd. (11th Cir. 2011) 439 Fed. Appx. 841 [2011 U.S. App. Lexis 18184].) Those cases found, with minimal statutory analysis, that an SEC filing qualified as an administrative report, one of the types of public disclosures then identified in the statute as barring federal *qui tam* actions. (See former 31 U.S.C. § 3730(e)(4) (2006) ["[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation,

or from the news media unless the action is brought by the Attorney General or the person bringing the action is an original source of the information"].)[7]

The Attorney General's (and the trial court's) reliance on those federal cases is misplaced.  Although CFCA is patterned after the federal False Claims Act as amended in 1986, and federal authorities interpreting the federal act are often looked to for guidance "to the extent the language of the two acts is similar" (*Fassberg Construction Co. v. Housing Authority of the City of Los Angeles* (2007) 152 Cal.App.4th 720, 735; accord, *State of California v. Altus Finance, supra,* 36 Cal.4th at p. 1299; *Wells v. One2One Learning Foundation, supra,* 39 Cal.4th at p. 1197), on this critical point the language in the two statutes is markedly different.  (See *Harris, supra,* 39 Cal.4th at p. 1234 ["though the CFCA was patterned after the [federal False Claims Act] as then recently amended, there are significant differences between the two statutes"].)  Fundamentally, the two Acts are designed to protect against similar but distinct harms. The federal False Claims Act was intended to assist the federal government in identifying and prosecuting fraud committed against it and its agencies; CFCA, as discussed, was designed to do the same thing as to fraud committed against the State and its political subdivisions.  The rationale for limiting the types of public disclosures that invoke the

---

[7]      *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson* (2010) 559 U.S. 280, 293 [130 S.Ct. 1396, 176 L.Ed.2d 225] (*Graham*), interpreting the same provision, held the federal bar encompassed all administrative reports, whether federal or state.  In reaching that conclusion, the Court relied on the absence of any qualifying language in the governing statute limiting the type of administrative report that would act to bar a *qui tam* action.  (*Id.* at p. 293.)  Former subdivision (d)(3)(A), in contrast, contains significant qualifying language.

*Graham* has little precedential value.  Shortly before *Graham* was decided, Congress had amended the federal public disclosure provision, making clear its bar applied only to disclosures made in certain *federal* fora.  (See 31 U.S.C. § 3730(e)(4)(A)) [court shall dismiss a qui tam action if "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed [¶] (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; [¶] (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or [¶] (iii) from the news media"].)

statutes' disclosure bars is thus readily apparent: "Federal government officials will often have no reason to be aware of information that is disclosed in state and local proceedings. A person who brings that information to the federal Government may still be providing the Government information about which it is unaware and about which it is unlikely to learn." (Sylvia, *The False Claims Act, supra,* § 11:39.) Likewise, state officials may be unaware of information disclosed solely to or by the federal government; and a relator with information about a state or local fraud, even if that misconduct has been publicly disclosed in a federal forum, may still be making a valuable contribution to state or local authorities that is properly rewarded under CFCA.

The legislative history of CFCA reinforces our analysis. The California statute was enacted in 1987 after the Center for Law in the Public Interest, the source of both the 1986 amendments to the federal False Claims Act and Assembly Bill No. 1441 (1987-1988 Reg. Sess.), which ultimately became CFCA, recognized that the federal act applied to frauds against the federal fisc, but not those that victimized state and local governments: "[T]he federal [False Claims] Act, however, applies only to federal claims, and the Center found that many complaints involve misappropriation of state, county, school district or municipal funds. The finding has prompted the Center to draft this state version of the federal legislation." (See Sen. Com. on Judiciary, 1987-1988, Reg. Sess. Assem. Bill No. 1441, com., July 9, 1987.) The Center's section-by-section analysis of CFCA prepared in 1987 similarly showed that the relevant public disclosures barred by former subdivision (d)(3)(A) were those made in State fora. (See Center for Law in the Public Interest, California False Claims Act: Section-by-Section Analysis of Assem. Bill No. 1441 (1987) [identifying investigations, reports, hearings and audits by "State Senate, State Assembly State Auditor, or governing body of a political subdivision" as the relevant fora in category two of the public disclosure bar].)

At its core, the State's real objection to this lawsuit is rooted in public policy: Bartlett's lawsuit, the Attorney General argues, is exactly the kind of parasitic action the public disclosure bar was intended to prevent. This is not a case, she observes, where Bartlett assisted the State in ferreting out fraud. To the contrary, the State had been

14

investigating ClubCorp's escheatment practices since 2008, long before Bartlett discovered the issue and filed this action. Thus, far from enlightening the State about ClubCorp's escheatment practices, the effect of Bartlett's *qui tam* action is simply to require the State to share any recovery it may obtain with someone who added nothing to the endeavor. (See *Mao's Kitchen, Inc. v. Mundy, supra,* 209 Cal.App.4th at p. 146.)

We are not unsympathetic to the State's argument. In light of the State's on-going investigation, it is difficult to imagine what benefit Bartlett's lawsuit adds to the State's effort to discover and prosecute the alleged fraud against it. Nonetheless, the government's knowledge and behind-the-scenes investigation of the facts alleged in the relator's *qui tam* action is not, by itself, a public disclosure, and is insufficient to trigger that jurisdictional bar. (See *Mao's Kitchen, Inc. v. Mundy, supra,* 209 Cal.App.4th at p. 149 ["'A "public disclosure" requires that there be some act of disclosure to the public outside of the government. The mere fact that the disclosures are contained in government files someplace, or even that the government is conducting an investigation behind the scenes, does not itself constitute public disclosure'"]; see also *United States ex rel. Rost v. Pfizer, Inc.* (1st Cir. 2007) 507 F.3d 720, 728 [same analysis under federal False Claims Act]; *Kennard v. Comstock Res., Inc.* (10th Cir. 2004) 363 F.3d 1039, 1043 [the public disclosure requirement "clearly contemplates that the information be in the public domain in some capacity and the Government is not the equivalent of the public domain"].)[8] Absent a public disclosure of the State's audit or investigation in one of the

---

[8]     Prior to 1943 nothing in the federal False Claims Act precluded a *qui tam* plaintiff from bringing an action based on information that was a matter of public record or in the government's possession. In 1943, however, after parasitic *qui tam* actions based on information in public reports and public government hearings had skyrocketed, Congress amended the federal False Claims Act to bar *qui tam* actions "'based upon evidence or information in the possession of the United States, or any agency, officer, or employee thereof, at the time such suit was brought.' [Citation.] This amendment erected what came to be known as a Government knowledge bar: '[O]nce the United States learned of a false claim, only the Government could assert its rights under the [federal False Claims Act] against the false claimant.' [Citation.] In the years that followed the 1943 amendment, the volume and efficacy of *qui tam* litigation dwindled." (*Graham*, *supra*, 559 U.S. at p. 294.) Concluding "that a total bar on *qui tam* actions based on information

15

venues or by the means identified in CFCA, there is no basis for dismissal of the action under CFCA's public disclosure bar, which is all the court considered in this case.

### b. *Audit*

The Attorney General also contends Bartlett's *qui tam* claim is barred because it is based on allegations or transactions that were the subject of a State audit. (See former subd. (d)(3)(A) [claims based on allegations publicly disclosed in State audit are barred].) However, as the Attorney General effectively concedes, there was no public disclosure of the audit apart from statements in the SEC filing. Because, as we have explained, the SEC filing is not a public disclosure in one of the fora identified in CFCA, this argument necessarily fails. Moreover, ClubCorp's SEC filings did not identify California as one of the states participating in the multistate audit, and it is apparent from the information that was disclosed that not all states in which ClubCorp owns private clubs were participants in that audit.

### c. *The SEC filings are not disclosures in the news media*

ClubCorp Porter Valley Country Club, Inc. and Gene Miller have also filed a responsive brief on appeal, arguing the information in the SEC filings qualifies as a public disclosure by the news media because those filings are accessible on the SEC's online public database,[9] a theory not advanced by the State or considered by the trial

---

already in the Government's possession [had] thwarted a significant number of potentially valuable claims," in 1986 Congress amended the federal False Claims Act and replaced the "Government knowledge bar" with the public disclosure bar, an amendment widely recognized as "an effort to strike a balance between encouraging private persons to root out fraud and stifling [purely] parasitic lawsuits . . . ." (*Id.* at p. 295.)

[9] The database, named EDGAR—Electronic Data Gathering, Analysis, and Retrieval—"performs automated collection, validation, indexing, acceptance, and forwarding of submissions by companies and others who are required by law to file forms with the U.S. Securities and Exchange Commission (SEC). Its primary purpose is to increase the efficiency and fairness of the securities market for the benefit of investors, corporations, and the economy by accelerating the receipt, acceptance, dissemination, and analysis of time-sensitive corporate information filed with the agency." (U.S. Securities and Exchange Commission, Important Information About EDGAR <https://www.sec.gov/edgar/aboutedgar.htm> [as of January 19, 2016].)

court. Even if these defendants have standing on appeal,[10] their argument lacks merit. To be sure, the advent of online news sites, blogs and social media has blurred the line between what has traditionally been considered news media and other forms of public discussion. (See generally Sherman, *Using the Internet To Your Company's Advantage In Defending Against a Whistleblower Action* (2012) 15 No. 8 J. Internet L. 3 ["[w]ith the exponential growth of the internet, the meaning of news media has expanded to include blogs, online news, and social networking sites"].) Still, wherever that fuzzy line now is between news media and some other form of publicly accessible information, we have little difficulty concluding that disclosures in forms available only on the SEC's online public database are not disclosures by the news media no matter how broadly that term is interpreted.

For the policy reasons articulated by the Attorney General in her brief, the Legislature may well conclude it should amend CFCA to include information available through the Internet as one of the categories within the public disclosure bar. However, given the plain language of both former and current section 12652, subdivision (d)(3)(A), and the rules of statutory construction, we have no power to do what the Legislature has to date chosen not to do. (See *Stavropoulos v. Superior Court* (2006) 141 Cal.App.4th 190, 197.) Should the case proceed,[11] the value of Bartlett's assistance will have to be

---

10      ClubCorp Porter Valley Country Club Inc. and Gene Miller were served with the original complaint but not the amended *qui tam* complaint, which was properly filed under seal. They did not participate in the State's motion to dismiss and filed their brief on appeal after the sealing order was lifted.

11      ClubCorp has advanced an alternative argument not raised by the State in the trial court or on appeal. Rather than focusing on the SEC filings, as did the State, ClubCorp argues the allegations regarding ClubCorp's handling of initiation deposits in Bartlett's original complaint constituted a disqualifying public disclosure in a civil hearing of its allegedly unlawful escheatment practices (former § 12652, subd. (d)(3)(A)), and Bartlett's *qui tam* action can proceed only if he qualifies as "an original source" under the statute, which ClubCorp asserts he does not. (See former § 12652, subd. (d)(3)(B) ["original source" means "an individual who has direct and independent knowledge of the information on which the allegations are based, who voluntarily provided the information to the state or political subdivision before filing an action based on that

assessed not by barring the *qui tam* action, but by determining the extent to which he "substantially contributes," if at all, to its prosecution.  (See § 12652, subd. (g)(2) [authorizing measure of recovery for *qui tam* plaintiff dependent upon extent to which he or she "substantially contributed" to State's prosecution of the action].)

## DISPOSITION

The order dismissing Bartlett's *qui tam* claim is reversed, and the matter is remanded for further proceedings not inconsistent with this opinion.  Bartlett is to recover his costs on appeal.


PERLUSS, P. J.


We concur:


SEGAL, J.                                    BECKLOFF, J.[*]

---

information, and whose information provided the basis or catalyst for the investigation, hearing, audit, or report that led to the public disclosure as described in subparagraph (A)"].)

The trial court has not had the opportunity to consider whether the sparse allegations concerning ClubCorp's escheatment practices in the original complaint amounted to a public disclosure sufficient to trigger the statutory bar of former section 12652, subdivision (d)(3), and, if so, whether Bartlett is an original source as that term is statutorily defined.  Those questions, which will necessarily include a determination whether Bartlett voluntarily provided the information to the State before filing his *qui tam* action, may require a more fully developed factual record and, in any event, are properly decided by the trial court in the first instance.  (See generally *Mao's Kitchen, Inc. v. Mundy, supra,* 209 Cal.App.4th at pp. 146-150 [deciding question of applicability of public disclosure bar on summary judgment rather than as a pleading motion].)

[*]        Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.